**YARMUTH–DION, INC., Peter Dion, Inc., and Peter Dion, Plaintiffs–Appellants,**

v.

**D'ION FURS, INC., Defendant–Appellee.**

**No. 180, Docket 87–7423.**

United States Court of Appeals, Second Circuit.

Argued Sept. 16, 1987.

Decided Dec. 22, 1987.

James Hamilton, Washington, D.C. (Mary Helen Sears, Samuel H. Black, David G. Sumner, Ginsburg, Feldman and Bress, Washington, D.C., Paul Frohman, Alfieri, Frohman, Unger & Primoff, New York City, of counsel), for plaintiffs-appellants.

George Gottlieb, New York City (Jeffrey M. Kaden, Gottlieb, Rackman & Reisman, New York City, of counsel), for defendant-appellee.

Before CARDAMONE, WINTER and MINER, Circuit Judges.

CARDAMONE, Circuit Judge:

Yarmuth–Dion, Inc., Peter Dion, Inc., and Peter Dion (collectively Dion or Peter Dion) appeal from an April 21, 1987 judgment of the United States District Court for the Southern District of New York (Griesa, J.) dismissing their amended complaint against D'ion Furs, Inc. (D'ion Furs). The judgment was based on an oral decision rendered April 9, 1987, in which Judge Griesa held that Peter Dion had failed to prove secondary meaning necessary to sustain a Lanham Act claim for false designation of origin. The trial court also dismissed Peter Dion's New York state law claims for dilution and the use of a misleading trade name.

The substance of this appeal is whether an unregistered mark that consists of Peter Dion's personal name has acquired secondary meaning so as to be entitled to Lanham Act protection. Historically, by indicating a product's source, a mark protects both the public from confusion and the owner in his trade. The complaint before us in effect disputes Iago's utterance, "But he that filches from me my good name Robs me of that which not enriches him, And makes me poor indeed" (W. Shakespeare, *Othello*, act III, scene iii, line 159 (W. Craig ed. 1928)), because here Peter Dion claims that the alleged infringer of his name *is* enriched by the infringement. We reverse and remand for further proceedings.

## BACKGROUND

All parties to this appeal are actively involved in the fur industry. Based in New York, Peter Dion is a distinguished designer, manufacturer, and wholesaler of fine fur garments. Dion was born in Greece under the name Peter Dionisiou and immigrated to the United States in the early 1950's. He changed his legal name to "Dion" in 1973. Dion began his career at the New York firm of Hiller and Becker, a renowned manufacturer of fur garments, and his talents soon became apparent. In 1974 the firm began to manufacture coats under the Peter Dion label. Eventually Dion became the owner of the business and changed its name to Peter Dion, Inc. Later, he acquired Yarmuth Furs, Inc., a fur jobber, and called it Yarmuth–Dion, Inc.

In 1982 Peter Dion and James Galanos, a leading fashion designer, entered into an agreement under which Dion manufactures fur garments designed by Galanos. Galanos furs are distributed only through the country's best known department stores catering to the carriage trade, such as Bergdorf Goodman in New York and Nieman–Marcus in Dallas. The Galanos label —not the Peter Dion label—appears on these furs together with that of the store. In addition, Peter Dion sells garments of

his own design and manufacture to retailers in Chicago such as McElroy Furs, Marshall Field's, and the Chicago branches of Nieman–Marcus and Saks Fifth Avenue. These garments are sold under the retailer's private label, though there is evidence that salesclerks occasionally use the name Peter Dion to clinch a fur sale.

Unlike Peter Dion, appellee D'ion Furs is a retailer selling directly to the public. D'ion Furs was established in 1983 by Denis and Diane Dionissopoulos and at the time of the district court's decision had two retail stores located in Niles and Oaklawn, Illinois, both suburbs of Chicago. D'ion Furs has since established a store in Chicago on Michigan Avenue. It is a high volume discounter advertising extensively in the Chicago area. Its purchase at the 1986 Seattle fur auction of high-quality "Blackglama" mink skins was announced in *Fur Age Weekly,* and in December 1985 it ran a full-page advertisement in *Vogue,* a nationally distributed fashion magazine, inviting telephone and mail orders.

In a letter dated February 10, 1986 Peter Dion charged the Dionissopouloses with trademark infringement and unfair competition. A complaint was subsequently filed in the Southern District of New York seeking relief, including an injunction and damages, on four grounds:

(1) § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1982), (2) common law trademark and trade name infringement, (3) state law trademark or trade name dilution, N.Y. Gen.Bus.Law § 368–d (McKinney 1984), and (4) misleading trade name, *id.* § 133 (McKinney 1968).

After an eight-day bench trial, the district court dismissed the complaint. Initially, it narrowed the relevant geographic market to the Chicago area. It then ruled that though "Dion" had acquired secondary meaning in the Chicago *wholesale* fur market, the relevant market for assessing secondary meaning was the Chicago *retail* market. The trial court found that within that market, only two groups of customers knew of Peter Dion and his association with high quality fur garments: first, select Neiman–Marcus customers who be-

came personally acquainted with Peter Dion through Nieman–Marcus promotions and, second, customers who had Peter Dion's name mentioned to them in an effort to close the sale. The district judge held that within the former group there was no appreciable likelihood of confusion between Peter Dion and D'ion Furs and stated concerning the latter group that they "are not an appreciable part of the fur market in Chicago," and "whatever is done to introduce them to the name of Peter Dion ... does not create secondary meaning within the meaning of the rules of law which must be applied here."

Because "Dion" had not acquired secondary meaning in the retail fur market in Chicago, the district court concluded that Peter Dion's mark and trade name were not protectible under the Lanham Act. Accordingly, it dismissed appellants' claims under that Act and dismissed the New York state law antidilution claim, stating that it could not "possibly apply, because the claim relates to Illinois." It also dismissed the state law claim for using a misleading trade name, presumably for the same reason.

## DISCUSSION

### I  *The Lanham Act Claim*

Section 43(a) of the Lanham Act provides that

"[a]ny person who shall ... annex, or use in connection with any goods or services, ... a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, ... shall be liable to a civil action ... by any person who believes that he is ... damaged by the use of any such false description or representation."

15 U.S.C. § 1125(a) (1982). This provision protects unregistered marks or trade names such as Peter Dion's.

■ We have developed a two-step test for determining whether an unregistered mark has been infringed. First, a plaintiff must demonstrate that his mark merits protection under the Lanham Act. *Thomp-*

*son Medical Co. v. Pfizer Inc.*, 753 F.2d 208, 212–13 (2d Cir.1985). Then, if the mark is protectible, the plaintiff must establish the likelihood of confusion, that is, "that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." *Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 47 (2d Cir.1978) (per curiam), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed. 2d 75 (1979). A trial court determines "likelihood of confusion" by examining many factors, including:

> the strength of [the plaintiff's] mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the prior owner will bridge the gap, actual confusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product, and the sophistication of the buyers.

*Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961).

▮ To resolve the first question— whether Peter Dion's name is eligible for trademark protection—we must first classify the mark. "Peter Dion" or "Dion," being a personal name, is a descriptive mark. *See Abraham Zion Corp. v. Lebow*, 761 F.2d 93, 104 (2d Cir.1985); 3A R. Callmann, *The Law of Unfair Competition, Trademarks and Monopolies* § 21.36, at 145 (4th ed. 1983) ("An individual name is rather similar to a descriptive word, in the sense that it might properly be regarded as a convenient description of the fact that the named individual is or was affiliated with the firm."). As a descriptive mark, the name is protectible under the Act only when it has acquired secondary meaning. *Thompson*, 753 F.2d at 216.

▮ Peter Dion argues that proof of secondary meaning should not be required in this case. He asserts that as against Diane and Denis Dionissopoulos, who do not legally bear the name "D'ion" or "Dion," he has an absolute and exclusive right to use his legal name. While a senior user of a personal name historically might have a certain equitable priority in using his legal name as against a junior user who does not legally bear that name, *see, e.g., Societe Vinicole de Champagne v. Mumm*, 143 F.2d 240, 241 (2d Cir.1944); *Stephano Bros., Inc. v. Stamatopoulos*, 238 F. 89, 91–92 (2d Cir.1916), today proof of secondary meaning is required before a senior user's name is entitled to Lanham Act protection. *See Madrigal Audio Laboratories, Inc. v. Cello, Ltd.*, 799 F.2d 814, 822 (2d Cir.1986) (individual's personal name can acquire secondary meaning and thereby merit Lanham Act protection as trade name); *Abraham Zion*, 761 F.2d at 104 (same); *Taylor Wine Co. v. Bully Hill Vineyards, Inc.*, 569 F.2d 731, 734 (2d Cir. 1978) ("Once an individual's name has *acquired a secondary meaning* in the marketplace, a later competitor who seeks to use the same or similar name must take 'reasonable precautions to prevent the mistake.'") (emphasis added) (quoting *L.E. Waterman Co. v. Modern Pen Co.*, 235 U.S. 88, 94, 35 S.Ct. 91, 92, 59 L.Ed. 142 (1914)).

We turn now to the trial court's resolution of whether Peter Dion proved secondary meaning had attached to his name.

### A. *Secondary Meaning*

A mark or trade name has acquired secondary meaning if "a purchaser will associate it with a certain producer, and will be likely to make that same association when an identical mark (or a confusingly similar mark), is used on another producer's product." *Thompson*, 753 F.2d at 215–16. The existence of secondary meaning is an inherently factual inquiry in which in the past we have examined: (1) the senior user's advertising expenditures, (2) consumer studies linking the name to the source, (3) sales success, (4) unsolicited media coverage of the product, (5) attempts to plagiarize the mark, and (6) length and exclusivity of the mark's use. *Id.* at 217. The trial court's finding as to secondary meaning is subject to a clearly erroneous standard of review. *See McGregor–Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1133 n. 4 (2d

Cir.1979). In addition, in any trademark case we must "be sure the District Court applied the correct legal standard[s] and correct criteria," *see, e.g., Vitarroz Corp. v. Borden, Inc.*, 644 F.2d 960, 968 (2d Cir. 1981), though express recitation of the relevant test is not a *sine qua non* of affirmance, *see, e.g., Abraham Zion*, 761 F.2d at 105 (*Polaroid* test not recited explicitly).

The district court stated that though "Dion" had "acquired a very strong secondary meaning in the wholesale [fur] trade" in Chicago, there was no likelihood of confusion between Peter Dion and D'ion Furs in that segment of the market. As noted, it believed that the Chicago retail market was the relevant one to examine. Not considered was the contention that Peter Dion's customers on hearing of D'ion Furs might well believe (as did a Michigan retailer) that their supplier Dion had gone into the retail end of the business and was now competing directly against them. Instead, concentrating entirely on evidence of Chicago department store patrons who associated "Dion" with fine quality furs, the trial court eliminated those who had become personally acquainted with Peter Dion because they were unlikely to be confused. Having thus eliminated the majority of potential customers for luxury furs who might associate Peter Dion with fine quality, the district judge counted the soldiers left standing—those customers who had Peter Dion's name mentioned to them in a sales pitch—and found that they were not "an appreciable part of the fur market in Chicago." It then ruled that Peter Dion had failed to establish secondary meaning. No mention of—or even an allusion to— *Thompson* was made.

■ The district court's approach incorrectly juxtaposed *Thompson* and *Polaroid* factors. First, its subjective inquiry, under which Peter Dion was required to prove that an "appreciable" quantum of consumers associated his name with his product in order to establish secondary meaning, was an erroneous interpretation of the law. *See, e.g., American Footwear Corp. v. General Footwear Co.*, 609 F.2d 655, 663 (2d Cir.1979) ("The crucial ques-

tion in a case involving 'secondary meaning' always is whether the public is moved in *any degree* to buy an article because of its source.") (emphasis supplied), *cert. denied*, 445 U.S. 951, 100 S.Ct. 1601, 63 L.Ed.2d 787 (1980). The existence of "appreciable" numbers of consumers is only necessary in determining likelihood of confusion. *See, e.g., Mushroom Makers*, 580 F.2d at 47.

■ In addition, segmenting the fur trade into wholesale and retail markets of a certain geographic region *before* assessing secondary meaning effectively deprives the *Thompson* and *Polaroid* tests of their significance as separate and independent inquiries, even though a narrowing of the relevant group of consumers might in certain cases be appropriate when reviewing secondary meaning. *See Centaur Communications, Ltd. v. A/S/M Communications, Inc.*, 830 F.2d 1217, 1221 (2d Cir. 1987) ("[I]t is not always the *general* public's understanding but—depending upon the product—often only a segment of consumers that need be examined.") (emphasis in original). But, when a wholesaler and retailer compete, as in the case at bar, the distinction between the wholesale and retail markets is primarily relevant to the likelihood of confusion under *Polaroid*. *See Vitarroz*, 644 F.2d at 967 (structure of relevant market a consideration in assessing product proximity); *Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358, 364–65 (2d Cir.1959) (applying wholesale/retail distinction to issue of confusion); *Habitat Design Holdings, Ltd. v. Habitat, Inc.*, 436 F.Supp. 327, 332–33 (S.D. N.Y.1977) (same), *aff'd mem.*, 573 F.2d 1290 (2d Cir.1978); *see also World Carpets, Inc. v. Dick Littrell's New World Carpets*, 438 F.2d 482, 487–88 (5th Cir. 1971) (same). Similarly, the disparity in the geographic markets of Peter Dion and D'ion Furs was also a factor for gauging confusion rather than one for assessing secondary meaning. *See Dawn Donut*, 267 F.2d at 364; *see also C.L.A.S.S. Promotions, Inc. v. D.S. Magazines, Inc.*, 753 F.2d 14, 18 (2d Cir.1985) (differences in geographical distribution relevant to prod-

uct proximity); 3A R. Callmann, *supra*, at § 20.48.

In sum, the trial court's apparent disregard of the *Thompson* factors for determining secondary meaning in favor of a precise geographical and functional segmentation of the fur market and a methodical weeding out of retail customers who might know of Peter Dion was clearly erroneous. Nor is this a case where despite the lack of a litany that recited the relevant tests, we can be assured that the trial court applied the correct legal criteria. We therefore reverse the finding that Peter Dion had failed to prove secondary meaning and remand the case for an application of the *Thompson* factors to that issue.[1]

### B. *Likelihood of Confusion*

Because the district court's determination rested on its conclusion that secondary meaning had not been established, it found no need to rule on the likelihood of confusion between Peter Dion and D'ion Furs. If, on remand, the court's application of *Thompson* leads to a finding of secondary meaning, an analysis of the *Polaroid* factors—including the disparity in trade channels and geographical markets—will of course be warranted to assess the likelihood of confusion. In that connection we note that, contrary to the district court's assertion, we have never held that "reverse confusion"—an instance in which a person acquainted with the junior user's name becomes confused when confronted with the senior user's name—is not actionable under the Lanham Act. *See Lobo Enters., Inc. v. The Tunnel, Inc.*, 822 F.2d 331, 333 (2d Cir.1987); *Plus Prods. v. Plus Discount Foods, Inc.*, 722 F.2d 999, 1003–04 & n. 6 (2d Cir.1983).

### II *State Law Claims*

The trial court dismissed Peter Dion's state law claims on the ground that they related only to Illinois. Such ruling disregards Peter Dion's claim that D'ion Furs

injured him in his New York wholesale and limited retail activities. Accordingly, the pendent state law claims are also remanded for further consideration.

### CONCLUSION

For the reasons stated above, the judgment of the district court is reversed and the case is remanded to it for further proceedings in accordance with this opinion.

---

**1.** Several of the trial court's evidentiary rulings were based on its erroneous definition of the relevant market. For example, it excluded evidence that it believed was irrelevant of a Michi-

gan retailer who associated D'ion Furs with Peter Dion. Given our holding, many of these rulings merit reconsideration.