815 TONAWANDA STREET CORPORA-
TION, d/b/a "Fay's Leader Drugs,"
Plaintiff–Appellee,

v.

FAY'S DRUG COMPANY, INC.,
Defendant–Appellant.

No. 453, Docket 87–7701.

United States Court of Appeals,
Second Circuit.

Argued Jan. 6, 1988.

Decided March 23, 1988.

Peter K. Sommer, Buffalo, N.Y. (Sommer & Sommer, John R. Nuchereno, Buffalo, N.Y., of counsel), for plaintiff-appellee.

Richard Lehv, New York City (Weiss David Fross Zelnick & Lehrman, P.C., of counsel), for defendant-appellant.

Before VAN GRAAFEILAND, WINTER and ALTIMARI, Circuit Judges.

ALTIMARI, Circuit Judge:

Fay's Drug Company, Inc., appeals from an order of the United States District Court for the Western District of New York, John T. Elfvin, *Judge*, granting a permanent injunction in favor of the 815 Tonawanda Street Corporation in plaintiff's action for trademark infringement and unfair competition. We conclude that plaintiff failed to establish any entitlement to relief on either its federal or state-law claims, and we reverse the judgment of the district court. The defendant is instructed to adopt a modified logo to be used on all exterior signs on the store at issue in this case.

## BACKGROUND

### The Parties

In 1936, Fay's Cut–Rate Drugs began doing business at 815 Tonawanda St. in Buffalo, New York. Shortly thereafter, its trade name was changed to "Fay's Prescription Pharmacy." In 1955, the pharmacy became associated with the Leader drug store cooperative, and sometime thereafter changed its trade name to "Fay's Leader Drugs." In 1967, the 815 Tonawanda Street Corporation (the "Corporation" or "plaintiff"), the plaintiff in this action, purchased the inventory and goodwill of Fay's Leader Drugs. Robert A. Fiorella, a pharmacist, is president and owner of the Corporation, and continues to operate the business under the name Fay's Leader Drugs ("Fay's Leader"). Fay's Leader is located in the 14207 postal zip code region, which encompasses areas of Buffalo known as "Riverside" and "Black Rock." In 1985, Fay's Leader moved to larger quarters on the same block, at 801 Tonawanda St.

Although Fay's Leader derives as much as 50% of its revenues from the sale of prescription drugs, it also carries a wide variety of other items. The inventory includes goods typically encountered in drug stores, such as cosmetics and toiletries, as well as a selection of general merchandise. In addition to brand-name products, Fay's Leader carries a product line bearing the "Leader" private label.

Fay's Leader relies on the Leader cooperative almost exclusively for its advertising. The Leader advertising consists mainly of newspaper inserts portraying sale items available at the Leader drug stores, and listing all the Leader affiliates in the area.

According to plaintiff, Fay's Leader adopted a logo many years ago, in which the first three letters of "Fay's" are in script and the final "s" is printed. This logo currently appears on a sign overhanging the store. Directly under the word "Fay's" are the words "Leader Drug Store" enclosed in an oval. Fay's Leader never sought to register either the trade name "Fay's" or its "script/printed" logo.

The defendant in this action is Fay's Drug Company, Inc. ("Fay's Drugs"). Fay's Drugs was incorporated in 1966, and currently operates over 150 "Fay's Drugs" retail pharmacies, including 22 in the greater Buffalo area. Fay's Drugs opened its first Buffalo store in 1977. Since then it has engaged in extensive advertising in both print and broadcast media. According to defendant, Fay's Drugs has spent over $7.5 million on its Buffalo-area advertising between 1977 and the present.

The typical Fay's Drugs store is located in a "strip" shopping center, set back from the street, and has approximately 15,000 square feet of floor space. Fay's Drugs stores carry an exceptionally wide variety of general merchandise, including of course, standard drug store items. Included in the inventory are hundreds of products bearing the "Fay's Drugs" private label. Sales of prescription drugs account for approximately 30% of the company's revenues.

Apparently by coincidence, Fay's Drugs adopted a logo very similar to that used by Fay's Leader. The logo portrays the first three letters of "Fay's" in script, with the final "s" printed; the word "DRUGS" appears in block letters under the word "Fay's". The two words are enclosed within a regular trapezoidal border. Both parties claim to have been using their respective logos since the 1960s. In 1979, Fay's Drugs obtained federal registrations for its logo (to be used in connection with "retail drug store services"), and for the trademark "Fay's" (in connection with several of its private-label products).

*The Dispute*

In 1982, the storefront and sign on Fay's Leader were redesigned pursuant to a city-sponsored renovation project. The logo on the newly-erected sign was virtually identical to defendant's logo, including the trapezoid border. Robert Fiorella admitted that the new sign was an imitation of the Fay's Drugs logo, but claimed that the architects and designers were responsible for the sign's new appearance, rather than Fiorella himself.

The new Fay's Leader sign was brought to the attention of Fay's Drugs, and in March 1982, general counsel for Fay's Drugs wrote to Fiorella advising him of the probable trademark infringement. Fiorella subsequently had the sign redesigned once again, removing the trapezoid border and restoring the script/printed logo previously used by Fay's Leader.

The two Fays had no further cause to communicate until 1985, when Fiorella learned that Fay's Drugs was planning to open a retail store approximately five blocks away from Fay's Leader. Counsel for Fay's Leader wrote to the President of Fay's Drugs, asserting that "the operation of a pharmacy within the trading area of [Fay's Leader] would constitute unfair competition" and violate its common-law trademark rights. According to plaintiff, Fay's Leader had not objected to Fay's Drugs' previous entries into the Buffalo market, because none of the other Fay's Drugs stores were located in the "Riverside" or "Black Rock" sections of town.

Fay's Drugs, not surprisingly, was unwilling to scrap the plans for its newest store, which was scheduled to open in February 1987. On November 3, 1986, Fay's Leader commenced the instant action seeking to enjoin defendant from opening a new "Fay's Drugs" store at the proposed location. The complaint asserted claims for "false designation of origin" under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); common-law trademark infringement; injury to business reputation under N.Y.Gen.Bus.Law § 368–d (McKinney 1984), and unfair competition under New York law. The complaint also sought a declaration that plaintiff had "a superior right to use FAY's as a mark and/or name in connection with the operation of a retail drugstore in the territory-in-question." The defendant asserted a counterclaim for infringement of a registered mark under section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1).

The case was tried without a jury on December 11 and 12, 1986. Judge Elfvin concluded that Fay's Leader was entitled to relief on all its claims, except for the one based on N.Y.Gen.Bus.Law § 368–d. Judgment was entered granting permanent injunctive relief in favor of the plaintiff. The court's order provided:

> Defendant may open its store located within the 14207 zip code region and may market its private label products therein, that the defendant may not act further to expose any exterior signs containing the name "Fay's," that any of defendant's exterior signs or exterior advertising presently containing the name "Fay's" shall be shrouded, that window display signs or advertising visible to persons outside the defendant's store shall not contain the name "Fay's," that window displays of merchandise visible to persons outside the defendant's store shall minimize the display of the name "Fay's."

Fay's Drug Company opened its new store as scheduled in February 1987, under the trade name "FDC Pharmacy."

## DISCUSSION

The defendant, as noted previously, obtained federal registrations for the service mark "Fay's Drugs" and the trademark "Fay's" in 1979. These registered marks have become incontestable, pursuant to section 15 of the Lanham Act, 15 U.S.C. § 1065, because the marks were in continuous use for five years following the date of registration, and defendant filed an affidavit to that effect with the Patent and Trademark Office. *See* 15 U.S.C. § 1065(3).

Plaintiff nevertheless challenged defendant's right to use the "Fay's" marks under an exception to incontestability set forth in section 1065. This exception applies to prior users of the registered mark who have acquired "a valid right ... under the law of any State or Territory by use of a mark or trade name continuing from a date prior to the date of registration under this chapter of [the registrant's] mark." *Id.* According to *Wrist–Rocket Mfg. Co., Inc. v. Saunders Archery Co.,* 578 F.2d 727, 731 (8th Cir.1978), "the plain meaning of [the § 1065 exception] is that if a party has acquired common-law trademark rights continuing since before the publication of the federal registration, then to that extent the registration will not be incontestable." *See also Casual Corner Assoc., Inc. v. Casual Stores of Nevada, Inc.,* 493 F.2d 709, 712–13 (9th Cir.1974).

The district court observed that plaintiff had used the "Fay's" mark continuously, beginning long before defendant's registration of the mark. The court then concluded that under section 1065, plaintiff would be entitled to assert against defendant any rights it had acquired in the mark as of 1979. Our task is to determine whether the district court correctly evaluated the extent of plaintiff's rights, if any, in the "Fay's" mark.

### I. *The Lanham Act claim*

■ A claim for "false designation of origin" under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), may be asserted despite the lack of a registered trademark. *See Warner Bros., Inc. v. Gay Toys Inc.,*

658 F.2d 76, 77–78 (2d Cir.1981). Therefore, the fact that Fay's Leader never registered its marks does not preclude it from bringing an infringement action against Fay's Drugs.

Plaintiff's rights in the mark depend, however, on whether the "Fay's" mark is to be classified as "generic," "descriptive," "suggestive," "fanciful," or "arbitrary." *See generally Yarmuth–Dion, Inc. v. D'ion Furs, Inc.*, 835 F.2d 990, 993 (2d Cir.1987); *Abraham Zion Corp. v. Lebow*, 761 F.2d 93, 104 (2d Cir.1985); *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir.1976); 1 J. McCarthy, *Trademarks and Unfair Competition* § 11.1 (2d ed. 1984). Trademarks and trade names are accorded varying degrees of protection, depending upon which of the above categories they fall under.

A generic term is one which refers to the genus of which a particular product is a species. *See Abraham Zion*, 761 F.2d at 104. "Drugs," for example, would be a generic term. A term is descriptive "if it is descriptive of: the intended purpose, function or use of the goods; of the size of the goods, of the class of users of the goods, of a desirable characteristic of the goods, or of the end effect upon the user." 1 J. McCarthy, *Trademarks and Unfair Competition* § 11.5 at 442–43. "Cut–Rate," for example, would be a descriptive term. A suggestive term is one which "requires imagination, thought and perception to reach a conclusion as to the nature of goods." *Abercrombie & Fitch*, 537 F.2d at 11 (quoting *Stix Products, Inc. v. United Merchants & Manufacturers, Inc.*, 295 F.Supp. 479, 488 (S.D.N.Y.1968)). For example, the trademark "Playboy" was recently held to be suggestive with respect to the magazine title: while the term may have suggested the aspirations of the magazine's readers, it did not *describe* the product or its contents. *See Playboy Enterprises, Inc. v. Chuckleberry Publishing, Inc.*, 687 F.2d 563, 566–67 (2d Cir.1982). Fanciful terms are "coined" terms, which have no independent meaning, while arbitrary terms have a meaning, but one that is not usually associated with the particular product. *See Abraham Zion*, 761 F.2d at 104.

Generic terms are not entitled to any common-law trademark protection, nor may they be registered under the Lanham Act. *See Abercrombie & Fitch*, 537 F.2d at 9–10. Descriptive terms may be eligible for trademark protection, but only upon proof of "secondary meaning," *see Yarmuth–Dion*, 835 F.2d at 993; *Abraham Zion*, 761 F.2d at 104, which has been defined as "[t]he power of a name or other configuration to symbolize a particular business, product or company." *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 203 n. 5 (2d Cir.1979). Terms which are held to be suggestive, fanciful or arbitrary are entitled to trademark protection without proof of secondary meaning. *See Abraham Zion*, 761 F.2d at 104.

The district court concluded that Fay's Leader failed to establish that the "Fay's" mark, as applied to its store, had acquired secondary meaning. The court held, however, that "[a]t a minimum (protection-wise) [the "Fay's" mark] is 'suggestive' and may even be 'fanciful,' " and therefore Fay's Leader was entitled to protection without proof of secondary meaning. The court went on to conclude that Fay's Drugs' use of its trade name was likely to cause consumer confusion in the relevant market, and accordingly granted Fay's Leader the injunctive relief described above.

The court's conclusion that Fay's Leader failed to prove secondary meaning is not clearly erroneous and must be affirmed. A trademark or trade name will be found to have acquired secondary meaning where consumers have come to associate the mark with goods or services from a particular source. *See, e.g., Yarmuth–Dion*, 835 F.2d at 993; *Warner Bros., Inc. v. Gay Toys, Inc.*, 724 F.2d 327, 332–34 (2d Cir.1983); *Perfect Fit Industries, Inc. v. Acme Quilting Co., Inc.*, 618 F.2d 950, 952–53 (2d Cir.1980).

Fay's Leader bore the burden of proving secondary meaning in this case, because it was the party seeking to obtain legal pro-

tection for its mark. *See Eli Lilly and Co. v. Revlon, Inc.*, 577 F.Supp. 477, 483 (S.D. N.Y.1983); 1 J. McCarthy, *Trademarks and Unfair Competition* § 15.11 at 686. "[P]roof of secondary meaning entails vigorous evidentiary requirements." *Thompson Medical Co., Inc. v. Pfizer, Inc.*, 753 F.2d 208, 217 (2d Cir.1985) (quoting *Ralston Purina Co. v. Thomas J. Lipton, Inc.*, 341 F.Supp. 129, 134 (S.D.N.Y.1972)). Some of the factors this court has examined in determining whether a mark had secondary meaning include advertising expenditures, consumer surveys, media coverage, attempts to copy the mark, and length and exclusivity of use. *Thompson*, 753 F.2d at 217 (collecting cases).

■ In this case, plaintiff's evidence with respect to secondary meaning consisted largely of Mr. Fiorella's assertion that in the minds of his customers, the word "Fay's" signified the Fay's Leader store. Such "opinion" testimony by a proprietor is considered self-serving and of little probative value. *See generally* 1 J. McCarthy, *Trademarks and Unfair Competition* § 15.13 at 688–89. Fiorella also testified about a few items of misdirected mail, as well as instances where potential customers mistook *plaintiff's* store for one of *defendant's* Fay's Drug stores.

Fay's Leader did not conduct any consumer surveys, nor did it offer the testimony of any of its customers. Plaintiff's advertising, as we have already observed, was handled almost exclusively through the Leader cooperative. Fay's Leader had, it is true, enjoyed long and exclusive use of the "Fay's" mark before defendant's entry into the Buffalo market; nevertheless, the district court correctly concluded that in the absence of other "persuasive evidence [ ] demonstrating that consumers associate 'Fay's' with the plaintiff and its wares," Fay's Leader had failed to meet its burden of proving secondary meaning.

The district court erred, however, in concluding that Fay's Leader did not have to prove secondary meaning because "Fay's" was a suggestive or fanciful term. Fay is a commonly used woman's name. Although in this particular case, no one named Fay was ever associated with Fay's Leader, the plaintiff has offered no reason for us to consider "Fay's" as signifying anything other than the possessive form of a woman's name.

■ For the purpose of trademark analysis, personal names—both surnames and first names—are generally regarded as descriptive terms which require proof of secondary meaning. *See, e.g., Yarmuth–Dion*, 835 F.2d at 993; *Madrigal Audio Laboratories, Inc. v. Cello, Ltd.*, 799 F.2d 814, 822 (2d Cir.1986); *Abraham Zion*, 761 F.2d at 104; 1 J. Murphy, *Trademarks and Unfair Competition* § 13.2.

■ The court acknowledged this general rule, but held that it did not apply in this case because no person named Fay was associated with Fay's Leader. The court offered no explanation for creating such an exception and cited only the following statement from a well-known treatise:

An individual name is rather similar to a descriptive word, in the sense that it might properly be regarded as a convenient description of the fact that the named individual is or was affiliated with the firm.

3A R. Callmann, *The Law of Unfair Competition, Trademarks and Monopolies* § 21.36 at 145 (L. Altman 4th ed. 1983). The quoted statement merely offers a rationale for treating personal names as descriptive terms. It does not imply that proof of secondary meaning will be required only where an individual bearing the name is *actually affiliated* with the firm. Indeed, the phrase "might properly be regarded as a convenient description" suggests that the consumer's perception of the meaning of the trade name is more important than the roster of corporate personnel. To the buying public, the name "Fay's Leader" conveys the same *descriptive* impression, whether or not there is—or ever was—a real Fay.

Elsewhere in Callmann's treatise it is observed that "[a] name, even if it is not the actual name of an individual in the firm, may become a valid trademark by virtue of secondary meaning." 3 R. Call-

mann, *The Law of Unfair Competition, Trademarks and Monopolies* § 19.30 at 123. This statement casts further doubt on the validity of the district court's theory. Moreover, as defendant observes, it would not make sense to impose less stringent requirements of proof on a party using a personal name which is not his own, than on a party who uses his own name as a trade name. Such a policy would run counter to the common law's general solicitude of and willingness to protect the individual's right to use his own name in business. *See generally* 1 J. McCarthy, *Trademarks and Unfair Competition* § 13.3.

We conclude that plaintiff was required to prove secondary meaning in order to be entitled to federal trademark protection, even though there was no person named Fay associated with Fay's Leader. Because plaintiff failed to prove secondary meaning for the "Fay's" mark, Fay's Leader is entitled to no relief on its federal claims. We need not reach, and therefore we express no opinion about the district court's finding of a likelihood of confusion.

## II. *The Unfair Competition claim*

New York's law of unfair competition encompasses claims for infringement of an unregistered trade name or trademark. The district court, after concluding that plaintiff should prevail on its federal claim, held that Fay's Leader was also entitled to relief on its state-law unfair competition claim.

Under New York law, secondary meaning is ordinarily a required element of an unfair competition claim; under certain circumstances, however, it need not be proven. *See Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.,* 42 N.Y.2d 538, 542 n. 2, 399 N.Y.S.2d 628, 631 n. 2, 369 N.E.2d 1162, 1164 n. 2 (1977); *see generally* 1 J. McCarthy, *Trademarks and Unfair Competition* § 15.4. For example, "[t]here is no need to show ... secondary meaning, if instances of actual palming off and deception are involved." *Polo Fashions, Inc. v. Extra Special Products, Inc.,* 451 F.Supp. 555, 563 (S.D.N.Y.1978). *Accord Ralston Purina Co. v. Thomas J.*

*Lipton, Inc.,* 341 F.Supp. 129, 135 (S.D.N.Y.1972) (secondary meaning need not be proven where defendant has engaged in various "predatory practices").

According to *Saratoga Vichy Spring Co., Inc. v. Lehman,* 625 F.2d 1037, 1044 (2d Cir.1980), "[t]he essence of an unfair competition claim under New York law is that the defendant has misappropriated the labors and expenditures of another. *Central to this notion is some element of bad faith.*" (citations omitted) (emphasis added). *See, e.g., Hygienic Specialties Co. v. H.G. Salzman, Inc.,* 302 F.2d 614, 620 (2d Cir. 1962) (secondary meaning need not be proven where defendant engaged in actual deception of purchasers, palming off, or appropriation of property rights); *Norwich Pharmacal Co. v. Sterling Drug, Inc.,* 271 F.2d 569, 570–71 (2d Cir.1959), *cert. denied,* 362 U.S. 919, 80 S.Ct. 671, 4 L.Ed.2d 739 (1960) (same).

The district court concluded that defendant's behavior in this case obviated the need for plaintiff to prove secondary meaning for its trade name. The court's findings of fact, however, belie this conclusion. The court found "no evidence that defendant's adoption of 'Fay's' and its opening of a store in 14207 had been intended to trade on goodwill developed by and for the plaintiff." The court also found "that the defendant [had not] acted unfairly to usurp the plaintiff's mark, name and business." Indeed, even Fay's Leader admitted that "this is not a case of defendant trying to borrow plaintiff's established business reputation for its own use."

The only "unfair" conduct cited by the court was the fact that Fay's Drugs was aware of plaintiff's existence when it selected the location for its new store. But defendant did not attempt to create the impression that it was affiliated with Fay's Leader, nor is there any suggestion that defendant intended to capitalize on plaintiff's good will.

We do not believe that defendant's mere knowledge of Fay's Leader's existence amounts to the kind of "bad faith" or "predatory conduct" which can serve as a substitute for secondary meaning. "New

York law in this area is indeed flexible, but it is not that flexible." *Saratoga Vichy,* 625 F.2d at 1044. *See also Weiner King, Inc. v. Wiener King Corp.,* 615 F.2d 512, 522 (C.C.P.A.1980) (mere knowledge of the existence of prior user does not constitute bad faith).

We conclude, therefore, that Fay's Leader is not entitled to relief on its unfair competition claim.

### III. *The Fay's Logo*

■ Finally, Fay's Leader argues that even if the "Fay's" trade name is not entitled to protection, plaintiff is still entitled to injunctive relief to protect its script/printed logo. If a descriptive term is displayed in a distinctive lettering style, the logo itself may merit protection or registration, even though use of the term in a different lettering style could not be enjoined. *See FunnelcaP, Inc. v. Orion Industries, Inc.,* 421 F.Supp. 700, 711 (D.Del. 1976); *In re Jackson Hole Ski Corp.,* 190 U.S.P.Q. 175 (T.T.A.B.1976).

During oral argument of this appeal, defendant stipulated that it would be willing to modify the script/printed design of its "Fay's" logo for use on its new store. Defendant is hereby instructed that it may commence using the trade name "Fay's Drugs" for the store at issue in this litigation. Defendant shall, however, adopt a new lettering style for the word "Fay's" which is distinct from the plaintiff's script/printed design. Such modified logo is to appear on all exterior and window signs on the new store.

The decision of the district court is reversed. The defendant is, however, instructed to comply with the above instructions.