UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 08-1375**
_____

B & J ENTERPRISES, LTD, trading as Washington Talent
Agency,

              Plaintiff – Appellant,

       v.

KEN GIORDANO; ALBRECHT ENTERTAINMENT SERVICES,
INCORPORATED,

              Defendants – Appellees.

_____

Appeal from the United States District Court for the District of
Maryland, at Greenbelt. Marvin J. Garbis, Senior District
Judge. (8:06-cv-01235-MJG)

_____

Argued: March 24, 2009          Decided: May 18, 2009

_____

Before MICHAEL, MOTZ, and KING, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**ARGUED**: Louis Fireison, LOUIS FIREISON & ASSOCIATES, PA,
Bethesda, Maryland, for Appellant. William D. Day, GILL, SIPPEL
& GALLAGHER, Rockville, Maryland, for Appellees. **ON BRIEF**:
Vincent T. Lyon, Patricia H. Ley, LOUIS FIREISON & ASSOCIATES,
PA, Bethesda, Maryland, for Appellant.

_____

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Plaintiff B & J Enterprises, Ltd, appeals from a summary judgment award in favor of defendants Ken Giordano and Albrecht Entertainment Services, Incorporated, with respect to B & J's trademark infringement and cybersquatting claims. In its appeal, B & J contends that the district court erred in two respects: (1) by striking various letters and affidavits submitted by B & J on the summary judgment issue; and (2) by awarding summary judgment to the defendants and denying B & J's cross-motion for such relief. As explained below, we agree with the district court and affirm.

## I.

B & J operates a business that provides entertainment talent for events in the greater Washington, D.C. area (the relevant geographic area), using the name "Washington Talent Agency." Although B & J had used this name since 1967, it did not seek registration of the "Washington Talent Agency" mark until July 2006, after the initiation of this lawsuit.[1] In

---

[1] In July 2006, B & J filed an application to register "Washington Talent Agency" with the Patent and Trademark Office (the "PTO"). The PTO subsequently published the mark for opposition, and the defendants opposed B & J's application, which remained pending during the district court proceedings. In this opinion, we use the terms "mark," "service mark," and "trademark" somewhat interchangeably, referring to a mark that
(Continued)

2

January 2005, Albrecht, doing business as "USA Talent Agency," and Giordano, Albrecht's owner and chief executive officer, registered four separate domain names: "WashingtonTalentAgency.com," "MarylandTalentAgency.com," "VirginiaTalentAgency.com," and "ColoradoTalentAgency.com."[2] Each of these domain names is associated with a specific internet website, and each of the websites is a portal for Albrecht's parent website, "USATalentAgency.com."[3] Sometime after June 2005, B & J contacted the defendants, explained that B & J had been using the name "Washington Talent Agency" for almost forty years, informed the defendants that they were infringing on such use, and requested that such infringement activities cease. B & J also unsuccessfully sought to buy the

---

is federally registered or otherwise protected under federal law.

[2] A domain name is "any alphanumeric designation which is registered with or assigned by any domain name registrar, domain name registry, or other domain name registration authority as part of an electronic address on the Internet." 15 U.S.C. § 1127.

[3] When a consumer accesses the website of "WashingtonTalentAgency.com," limited information regarding the services offered by Albrecht in the greater Washington, D.C. area is made available. The website instructs such a consumer to "Click Here to Enter!" and provides a hyperlink to Albrecht's "USATalentAgency.com" website, which contains more extensive information concerning Albrecht's services.

domain name "WashingtonTalentAgency.com" from the defendants. When B & J's proposals were rejected, this lawsuit followed.

On May 15, 2006, B & J filed its complaint for injunctive and other relief in the District of Maryland, alleging two claims against the defendants: trademark infringement, under § 43 of the Lanham Act, 15 U.S.C. § 1125(a) (the "trademark claim"); and cybersquatting, pursuant to the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d) (the "cybersquatting claim"). Pertinent to both claims, B & J alleges that it has a valid and protectable trademark in the name "Washington Talent Agency," and that the defendants' use of the domain name "WashingtonTalentAgency.com" is likely to cause confusion among consumers. On the cybersquatting claim, B & J also alleges that the defendants acted in bad faith in securing the "WashingtonTalentAgency.com" domain name.

On June 6, 2007, following more than six months of discovery proceedings, the parties filed cross-motions for summary judgment. In their submission, the defendants maintained that they were entitled to summary judgment, under Rule 56 of the Federal Rules of Civil Procedure, on both the trademark claim and the cybersquatting claim. They asserted that "Washington Talent Agency" was not entitled to trademark protection, because it was either a generic term or a descriptive term that had not acquired secondary meaning. On

the cybersquatting claim, the defendants asserted that B & J had failed to show either secondary meaning or bad faith. B & J, on the other hand, sought summary judgment on its own behalf, maintaining that there was no genuine issue of material fact and that it was entitled to prevail on its claims as a matter of law.

On August 22, 2007, the district court heard argument on the cross-motions for summary judgment. At the hearing's conclusion, as reflected in its Order, the court stated that it would award summary judgment to the defendants and deny B & J's cross-request for such relief. See B & J Enters., Ltd v. Giordano, No. 8:06-cv-01235 (D. Md. Aug. 22, 2007) (the "Summary Judgment Order").[4] The court deferred entering a final judgment, however, authorizing B & J to seek reconsideration of the Summary Judgment Order. Such reconsideration was subject to multiple conditions: that B & J request reconsideration by October 22, 2007; that B & J pay part of the defendants' legal fees; and that B & J "submit evidence adequate to establish the existence of a genuine issue of material fact preventing summary judgment for Defendants." Id. at 1.

---

[4] The Summary Judgment Order is found at J.A. 242-43. (Citations herein to "J.A. __" refer to the contents of the Joint Appendix filed by the parties in this appeal.)

On October 17, 2007, B & J moved for reconsideration of the Summary Judgment Order. In support thereof, it submitted seven letters, containing statements and opinions concerning B & J and its business reputation in the greater Washington, D.C. area (the "Letters"). In response, the defendants moved to strike the Letters because they were unsworn and unauthenticated, and thus could not be considered on the summary judgment issue.

On December 6, 2007, the district court granted the defendants' motion to strike, directing that the Letters "shall not be part of the record in regard to Plaintiff's pending Motion for Reconsideration." B & J Enters., Ltd v. Giordano, No. 8:06-cv-01235, slip op. at 3 (D. Md. Dec. 6, 2007). In so ruling, the court reflected frustration with B & J and its counsel, observing that it was "unfortunate" that, "in view of the history of this case in which Plaintiff's counsel have been given one final chance to present evidence to avoid summary judgment, they would not have taken the minimal step of having the authors of the letters add thereto an endorsement signed under penalties of perjury." Id. at 2. Although the court recognized that "it is highly unlikely that the resolution of the instant motion will turn upon the presence or absence" of the Letters, it declined to consider them for summary judgment purposes. Id. at 2-3.

On December 20, 2007, two months after the reconsideration deadline had expired, B & J supplemented its reconsideration request, filing six affidavits attesting to the authenticity of the Letters (the "Affidavits"). On March 11, 2008, the district court filed an opinion denying reconsideration, striking the Affidavits, and explaining its views on the summary judgment issue. See B & J Enters., Ltd v. Giordano, No. 8:06-cv-01235 (D. Md. Mar. 11, 2008) (the "Reconsideration Opinion").[5] In particular, the court explained that it had "excluded from the summary judgment record certain 'evidence'" — namely the Affidavits filed on December 20, 2007 — because they were "not submitted by Plaintiff's counsel until well after the motion filing deadline and, indeed, even after the instant motion had been briefed." Id. at 11. The court also stated that, even if it had considered the Affidavits, its disposition of the summary judgment issue would be unaffected.

In awarding summary judgment to the defendants, the district court concluded that the name "Washington Talent Agency" was a geographically descriptive term, and thus only protected from use if it had acquired a secondary meaning. As the court explained, if the name "Washington Talent Agency" had acquired secondary meaning — thus providing B & J a protectable

_____

[5] The Reconsideration Opinion is found at J.A. 287-99.

7

trademark — "[t]here is no doubt . . . Defendants would have infringed the trademark, would have to cease use of the domain name 'WashintonTalentAgency.com,' and possibly be subject to liability under the [cybersquatting statute]." Reconsideration Opinion 4-5. The court emphasized, however, that "there is insufficient evidence from which a reasonable fact finder could find that the words 'Washington talent agency' had acquired a secondary meaning so as to entitle [B & J] to a protectable trademark for the name Washington Talent Agency." Id. at 11. Having decided that B & J did not possess a trademark in the name "Washington Talent Agency," the court rejected both of B & J's claims. The court thus denied the reconsideration request, awarded summary judgment to the defendants, and denied such relief to B & J.

On March 11, 2008, B & J filed its timely notice of appeal in this case. We possess jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

In seeking relief on appeal, B & J maintains that the district court erred in two respects. First, B & J asserts that the court erred in excluding the Letters and Affidavits from consideration on the summary judgment issue. Second, B & J contends that, in any event, the court erred in awarding summary

8

judgment to the defendants and in failing to award summary judgment to B & J. We assess these contentions in turn.

## A.

B & J first challenges the district court's decision to exclude the Letters and Affidavits from the summary judgment record. On December 6, 2007, the court struck the Letters, thus declining to consider them in the summary judgment proceedings. In its Reconsideration Opinion, the court also excluded the Affidavits, explaining that they were "not submitted by Plaintiff's counsel until well after the motion filing deadline and, indeed, even after the instant motion had been briefed." Reconsideration Opinion 11.

We review for abuse of discretion a trial court's exclusion of evidence from a summary judgment record. See Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc., 71 F.3d 119, 126 (4th Cir. 1995). Although a district court possesses broad discretion on whether to consider a tardy filing of summary judgment materials, see Fed. R. Civ. P. 6, a late filing should be authorized "only if cause or excusable neglect has been shown by the party failing to comply with the time provisions," Orsi v. Kirkwood, 999 F.2d 86, 91 (4th Cir. 1993).

Put simply, the district court did not abuse its discretion in excluding the Letters and Affidavits from the summary judgment record. First, B & J was not entitled to have the

9

Letters considered on the summary judgment issue because they were unsworn and unauthenticated. In order to be considered on summary judgment, "'documents must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e).'" Orsi, 999 F.2d at 92 (quoting 10A Charles A. Wright et al., Federal Practice and Procedure § 2722, at 58-60 (1983 & Supp. 1993)). Second, the court was within its discretion in striking the Affidavits. The Affidavits were untimely — submitted two months after the court's deadline, when B & J's reconsideration request was already ripe for disposition. Furthermore, the Affidavits were presented without any explanation for the delay or an assertion of excusable neglect. In such circumstances, we must reject B & J's contention that the court erred in striking the Letters and Affidavits.

B.

We next assess B & J's second contention, that the district court erred — even in the absence of the Letters and Affidavits — in making the summary judgment rulings. In a trademark dispute, we review de novo a district court's award of summary judgment. Carefirst of Md., Inc. v. First Care, P.C., 434 F.3d 263, 267 (4th Cir. 2006). Such an award is only appropriate when the summary judgment record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P.

10

56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In evaluating a summary judgment issue, the evidence of record must be viewed in the light most favorable to the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). A mere scintilla of proof, however, will not bar a summary judgment award; the question is "not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it." Id. at 251 (internal quotation marks omitted). Where "the nonmoving party has failed to make a sufficient showing on an essential element of [its] case, with respect to which [it] has the burden of proof," the moving party is entitled to summary judgment. Celotex Corp., 477 U.S. at 323.[6]

1.

In this proceeding, B & J seeks relief on two claims against the defendants: the trademark claim and the cybersquatting claim. Section 43(a) of the Lanham Act protects an unregistered mark from trademark infringement. See 15 U.S.C. § 1125(a) (creating action in favor of person damaged, or likely

---

[6] Cross-motions for summary judgment are reviewed under the same standard, and we therefore consider "each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotation marks omitted).

to be damaged, by the use in commerce of "any word, term, name, symbol, or device, or any combination thereof" which "is likely to cause confusion").[7] In order to maintain a cause of action for trademark infringement, a plaintiff must show (1) that "it has a valid, protectible trademark"; and (2) "that the defendant's use of a colorable imitation of the trademark is likely to cause confusion among consumers." Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc., 43 F.3d 922, 930 (4th Cir. 1995); see also 15 U.S.C. § 1125(a). Additionally, to establish a prima facie case of cybersquatting, a plaintiff must prove (1) that it possesses a valid, protectable trademark; (2) that the defendant registered, trafficked in, or used a domain name that is "identical or confusingly similar" to the plaintiff's trademark; and (3) that the defendant acted "with the bad faith intent to profit from the good will associated with the trademark." Retail Servs. Inc. v. Freebies Publ'g, 364 F.3d 535, 549 (4th Cir. 2004) (internal quotation marks omitted).

Thus, in order to prevail on either a trademark or cybersquatting claim, a plaintiff must "first and most

---

[7] In contrast to an unregistered mark, a federally registered trademark is protected from infringement under § 32 of the Lanham Act. See 15 U.S.C. § 1114(1). However, only a mark characterized as "distinctive" may be federally registered as a trademark. See id. § 1052(f).

fundamentally prove that it has a valid and protectable mark." U.S. Search, LLC v. US Search.com Inc., 300 F.3d 517, 523 (4th Cir. 2002) (internal quotation marks omitted); see also Retail Servs. Inc., 364 F.3d at 549 (explaining that "a prerequisite for bringing a [cybersquatting claim] is establishing the existence of a valid trademark"). This element — a valid and protectable mark — is therefore essential to each of B & J's claims. If B & J failed to make a sufficient showing on this element, the summary judgment award in favor of the defendants was appropriate. See Celotex Corp., 477 U.S. at 323.

Whether a mark is protected under federal law depends, first of all, upon its classification — either as "generic," "descriptive," "suggestive," or "arbitrary/fanciful." See U.S. Search, LLC, 300 F.3d at 523. Accordingly, the degree of protection accorded to a mark hinges on the extent of its distinctiveness. See id. In this case, the Reconsideration Opinion concluded that the name "Washington Talent Agency" should be classified as a "descriptive mark." And, the parties do not contest this point on appeal. As a descriptive mark, however, the name "Washington Talent Agency" is eligible for legal protection only if it has been shown to have acquired a "secondary meaning" in the eyes of the public. See id. Secondary meaning is generally accepted as "the consuming public's understanding that the mark, when used in context,

13

refers, not to what the descriptive word ordinarily describes, but to the particular business that the mark is meant to identify." Perini Corp. v. Perini Const., Inc., 915 F.2d 121, 125 (4th Cir. 1990). Furthermore, a trademark infringement plaintiff must show that its descriptive mark acquired such secondary meaning (1) in the defendant's trade area, and (2) prior to the time the defendant entered the market. See id. at 125-26.

In our Perini decision, we identified and spelled out six factors that are relevant to the resolution of the secondary meaning issue. See 915 F.2d at 125. Each of these factors should be assessed in a secondary meaning analysis: (1) plaintiff's advertising expenditures; (2) consumer studies linking the mark to a source; (3) the plaintiff's record of sales success; (4) unsolicited media coverage of the plaintiff's business; (5) attempts to plagiarize the mark; and (6) the length and exclusivity of the plaintiff's use of the mark. See id.; see also U.S. Search, LLC, 300 F.3d at 525. In Perini, Judge Murnaghan explained that none of the six factors is necessarily determinative of secondary meaning, and all of them need not be favorable for the plaintiff to prevail. See 915 F.2d at 125-26.

A trademark plaintiff, seeking to establish secondary meaning, faces a "rigorous evidentiary standard." U.S. Search,

14

LLC, 300 F.3d at 525. And, although a secondary meaning issue is generally for the trier of fact, when the plaintiff's evidence is sufficiently lacking, a trial court is entitled to conclude on summary judgment that its mark lacks secondary meaning. See id. at 525-26. In order to so rule, however, the court must view the facts in the light most favorable to the nonmoving party, and then reasonably conclude that a jury could not find for the plaintiff. See id. at 522, 525-26. As we have explained, if a plaintiff "cannot clear the [secondary meaning] hurdle; that is, it cannot show that its mark . . . is entitled to service mark protection," an award of summary judgment to the defendant is warranted. See id. at 523.

2.

In order to establish secondary meaning in the name "Washington Talent Agency," B & J was obliged to show that "a substantial number of present or prospective customers," when hearing or reading of the "Washington Talent Agency," would associate the name specifically with B & J's business. See Perini, 915 F.2d at 125 (internal quotation marks omitted). B & J was also obliged to show that such secondary meaning existed in Albrecht's trade area — the greater Washington, D.C. area — prior to January 2005 (when Albrecht entered the market). In evaluating the secondary meaning issue, the Reconsideration Opinion assessed each of the six Perini factors, analyzed the

15

relevant evidence, and concluded that "[t]he bottom line is that on the record, there is insufficient evidence from which a reasonable fact finder could find that the words 'Washington talent agency' had acquired a secondary meaning so as to entitle Plaintiff to a protectable trademark for the name Washington Talent Agency." Reconsideration Opinion 11.

Of the six Perini factors, the first (plaintiff's advertising expenditures) and the last (the length and exclusivity of the plaintiff's use of the mark) appear to be most supportive of B & J's secondary meaning contention. We will thus first separately evaluate those Perini factors, and then turn to the other four. Because no single factor is determinative, after considering each factor separately, we will assess whether — even evaluated cumulatively — B & J's evidence is sufficient to satisfy the secondary meaning requirement.

a.

On the first Perini factor (plaintiff's advertising expenditures), the Reconsideration Opinion related that B & J had presented the following evidence:

- "[T]ax returns for 17 years with deductions for advertising";[8]

---

[8] B & J presented its income tax returns for most of the years between 1970 and 2004. Those returns reflected annual deductions for advertising of as much as $67,000. In the five years between 2000 and 2004, such advertising deductions were in the sixty-thousand-dollar range.

16

- "Profit and Loss reports for 9 years with line items for advertising expenditures";

- "16 proofs of advertisements"; and

- "A letter from the Advertising Manager of <u>The Washingtonian</u> stating that Washington Talent Agency has run an advertisement in each issue of the Magazine since 2000."

Reconsideration Opinion 7. The district court deemed B & J's showing on advertising to be insufficient, however, explaining that the evidence was "by no means adequate to establish significant expenditures advertising the trademark 'Washington Talent Agency.'" <u>Id.</u>

In reaching this conclusion on the advertising factor, the district court observed that the evidence produced by B & J showed that its advertising expenditures had been made on "business promotions of some kind," rather than "for advertising that would tend to promote a secondary meaning" in the name "Washington Talent Agency." Reconsideration Opinion 7. The court explained this observation further, stating that, even if it assumed "all of these expenditures were devoted to advertisements using the name 'Washington Talent Agency,'" B & J had failed to show that its advertising expenditures were effective with consumers in the greater Washington, D.C. area, causing them to associate "Washington Talent Agency" with B & J. <u>Id.</u> at 8. Notably, the court concluded that, although B & J had

17

presented some advertising proofs as evidence — alleging that such advertising had appeared in various print media over the years — it failed to show the locations and dates of any publications, and had otherwise failed to present any actual advertisements. Id.[9]

We must recognize, in the context of this issue, that B & J made substantial expenditures of advertising funds over a period of several years. Nevertheless, we also agree with the district court that large advertising or promotional expenditures, while relevant to the issue of secondary meaning, are not dispositive. See Am. Footwear Corp. v. Gen. Footwear Co., 609 F.2d 655, 663 (2d Cir. 1979); see also E.T. Browne Drug Co. v. Cococare Prods., Inc., 538 F.3d 185, 199 (3d Cir. 2008) (describing first factor as "extent of . . . advertising leading to buyer association"). Absent a showing that such expenditures "were effective in causing the relevant group of consumers to associate the mark with itself," secondary meaning cannot be established. FM 103.1, Inc. v. Universal Broad. of N.Y., Inc.,

---

[9] B & J introduced evidence of only one published advertisement. It was a four-line, text-only classified advertisement (approximately three inches wide and an inch high) in The Washingtonian magazine that had appeared on a monthly basis for about five years. The district court concluded that this advertisement, viewed in the context of the surrounding ads, had only used the name "Washington Talent Agency" in a generic — rather than distinct — form.

929 F. Supp. 187, 196 (D.N.J. 1996); see also Dick's Sporting Goods, Inc. v. Dick's Clothing & Sporting Goods, Inc., No. 98-1653, 1999 WL 639165, at *7 (4th Cir. Aug. 20, 1999) (unpublished) (citing FM 103.1, Inc., 929 F. Supp. 187). On this record, B & J failed to present the context of its advertising expenditures, and, absent such a showing, a jury would make a leap of faith to conclude that the name "Washington Talent Agency" had gained secondary meaning in the relevant geographical area.

Notably, B & J's advertising evidence, viewed in the proper light, shows only that its advertising funds were expended generally; they are not shown as advertising the name "Washington Talent Agency" in the relevant area. There was no evidence of the quality, type, location, or duration of such advertising. Put simply, B & J should have shown that the advertising occurred in the greater Washington D.C. area — a connection essential to satisfying the first Perini factor. See Perini, 915 F.2d at 126 (concluding court erred by failing "to connect the plaintiff's nationwide statistics to the defendant's trade area").[10] Thus, although advertising is potentially

---

[10] Notably, the advertisement proofs fail to remedy the evidentiary deficiency on the first Perini factor. With no showing of location, duration, and frequency of advertisements, we are unable to conclude that customers in the greater
(Continued)

19

B & J's best showing on a Perini factor, we are unable to conclude that B & J has satisfied it.

b.

With respect to B & J's other potentially strong Perini factor — the sixth (the length and exclusivity of the plaintiff's use of the mark) — the name "Washington Talent Agency" had been used in B & J's business for almost forty years. The district court nevertheless concluded that such a period of use was alone insufficient to warrant a ruling in favor of B & J, because it had failed to show the exclusivity of such use in the relevant market. See Reconsideration Opinion 10-11. We agree — evidence of length of use, absent a showing of exclusivity, is inadequate to satisfy the sixth Perini factor. See U.S. Search, LCC, 300 F.3d at 526 n.12 ("Even assuming [plaintiff] has used 'U.S. Search' continuously since 1982 . . . length of time alone is insufficient to establish secondary meaning."); see also 815 Tonawanda Street Corp. v. Fay's Drug Co., 842 F.2d 643, 648 (2d Cir. 1988) (concluding no secondary meaning despite evidence of "long and exclusive use" of mark).

---

Washington, D.C. area would associate the name "Washington Talent Agency" with B & J.

20

c.

With respect to the other four <u>Perini</u> factors, the Reconsideration Opinion examined each of them and concluded that B & J's evidence was inadequate. Under our precedent, a particular factor is not satisfied when some evidence is produced, if that evidence is minimal or limited. <u>See</u> <u>U.S. Search, LLC</u>, 300 F.3d at 526 (concluding <u>Perini</u> factors one and three were not satisfied despite evidence of minimal advertising expenditures and limited sales success); <u>see also</u> <u>Laureyssens v. Idea Group, Inc.</u>, 964 F.2d 131, 136 (2d Cir. 1992) (concluding no secondary meaning in light of weak sales, low advertising expenditures and promotions, minimal unsolicited media coverage, and brief period of exclusive use).

Importantly, with respect to the second <u>Perini</u> factor (consumer studies linking the mark to a source), there was a notable absence of any such studies linking the name "Washington Talent Agency" to B & J. The absence of those studies is striking, because such evidence is "generally thought to be the most direct and persuasive way of establishing secondary meaning." <u>U.S. Search, LLC</u>, 300 F.3d at 526 n.13. As a result, B & J failed on the second <u>Perini</u> factor.

We agree with the Reconsideration Opinion that the third <u>Perini</u> factor (the plaintiff's record of sales success) was not satisfied because the supporting evidence was incomplete.

21

Although B & J presented some evidence concerning its sales history, it did not show sales success, if any, in the greater Washington, D.C. area. See Dick's Sporting Goods, Inc., 1999 WL 639165, at *7 (comparing plaintiff's gross sales to market's total sales volume).

In disposing of the fourth Perini factor (unsolicited media coverage of the plaintiff's business), the Reconsideration Opinion characterized it as "[q]uite telling[]" that, after almost forty years, B & J had forecast evidence of only one instance of unsolicited media coverage, a reference in an article in a high school newspaper. Reconsideration Opinion 9-10. Such media exposure was thus "an 'isolated incident' from which no reasonable jury could find 'widespread recognition in the minds of the consuming public, as alleged.'" Id. at 10 (quoting Dick's Sporting Goods, Inc., 1999 WL 639165, at *8). Finally, on the fifth Perini factor (attempts to plagiarize the mark), B & J's President acknowledged that he was unaware of any infringement or plagiarism prior to the defendants' activities. See id. We also agree with these assessments.

d.

In making a cumulative de novo assessment of the Perini factors — again in the light most favorable to B & J — the evidence shows that B & J used the name "Washington Talent Agency" in the greater Washington, D.C. area for almost forty

22

years, and that it expended substantial money on advertising. Although such evidence is relevant to establishing secondary meaning, it is insufficient to satisfy B & J's burden in this case. According every favorable inference to B & J on the Perini factors, it has nevertheless failed on the crucial question: whether "a substantial number of present or prospective customers," when hearing or reading of the "Washington Talent Agency," would associate the name specifically with B & J's business. Perini, 915 F.2d at 125 (internal quotation marks omitted); see also Anderson, 477 U.S. at 251 (requiring more than a scintilla of proof to preclude award of summary judgment); U.S. Search, LCC, 300 F.3d at 526 (explaining that despite evidence of advertising expenditures and sales success, summary judgment was appropriate).[11] Because B & J failed to establish secondary meaning — an essential element on which it has the burden of proof — the court properly awarded summary judgment to the defendants on each of B & J's

---

[11] B & J's final contention, that the district court should have accorded evidentiary weight to the PTO's publication of the "Washington Talent Agency" mark for opposition, see supra note 1, is also without merit. Although the PTO's issuance of a certificate of registration might provide a registrant with, inter alia, prima facie evidence of the validity of a mark, see U.S. Search, LCC, 300 F.3d at 524, B & J has provided no support for the legal proposition that a PTO publication is entitled to similar weight.

claims, and also properly denied B & J's summary judgment request.

### III.

Pursuant to the foregoing, we affirm the judgment of the district court.

<u>AFFIRMED</u>